**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ADG, LLC,

       Plaintiff/Counter-Defendant,

v.                                                    Case No. 11-15534

JAMES WHITE,

       Defendant/Counter-Plaintiff.

                          /

**OPINION AND ORDER GRANTING PLAINTIFF'S/COUNTER-DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff/Counter-Defendant ADG, LLC ("ADG") filed suit seeking a declaration

that it did not violate the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et*

*seq.*, during its employment of Defendant/Counter-Plaintiff James White.  White filed a

counter-claim alleging that ADG discriminated against him for being HIV-positive and

created a hostile work environment in violation of the ADA.  After the parties stipulated

to dismissing with prejudice White's hostile work environment claim, ADG moved for

summary judgment on the remaining unlawful discrimination claim.  The motion has

been fully briefed, and a hearing is unnecessary.  *See* E.D. Mich. LR 7.1(f)(2).  For the

following reasons, the court will grant the motion.

**I.  BACKGROUND**

ADG is a dental practice management company with over fifty dental practices in

Michigan.  (Pl.'s Mot. Summ. J. ¶ 1–2, Dkt. # 24.)  White began working as one of four

patient coordinators at ADG's facility in Sterling Heights, Michigan, in August 2008.  (*Id.*

¶ 2, 4.)  The patient coordinators worked at the front desk and rotated bi-weekly

between four identical "stations."  (*Id.* ¶ 4, 6.)  Each station was dedicated to a separate

duty, such as checking patients in, answering the telephone, and checking patients out.

(*Id.* ¶ 6.)  The ADG employee handbook states:

> [ADG] expects employees to be reliable and to be punctual in reporting for
> scheduled work.  Absenteeism and tardiness place a burden on other
> employees and on [ADG].  In the rare instances when employees cannot
> avoid being late to work or are unable to work as scheduled, they should
> notify their supervisor as soon as possible in advance of the tardiness or
> absence.

(*Id.* Ex. D at 2, Dkt. # 24-2.)

White received his first written warning on October 7, 2008, for missing two days

of work.  (*Id.* Ex. E at 5, Dkt. # 24-2.)  The warning explained that White had called in

sick on September 22, 2008, and again on October 6, 2008.  (*Id.*)  On the latter date,

White did not call or leave a message with the office until 3:00 p.m.  (*Id.*)  The warning

stated that White needed to exert more effort to attend work and inform the office as

soon as possible if he was going to miss work.  (*Id.*)  The warning concluded that White

"could be let go" if he did "not improve by December."  (*Id.*)

White met with his supervisors on November 25, 2008, to discuss his difficulties

with time management and completing tasks.  (*Id.* at 6.)  White claims that he was also

counseled at the meeting about the need to limit his absences, (*id.* Ex C at 58, Dkt.

# 24-1), however, the written warning that White received from the meeting does not

mention that this was discussed, (*id.* Ex. E at 6, Dkt. # 24-2).  The following day, White

submitted his two-week notice of resignation, (*id.* at 7), only to rescind that resignation

on the last day of the two-weeks, (*id.* Ex. C at 32, Dkt. # 24-1).

2

On January 16, 2009, White was diagnosed as HIV-positive.  (*Id.* at 17.)  He voluntarily told his fellow patient coordinators of his diagnosis, (*id.* at 18), and on January 22, 2009, also informed Dana Zartman, his supervisor and the office manager, (*id.* at 17).  White asked Zartman to keep his diagnosis confidential, but according to White, she relayed the information to Dr. Loyd Alpert, the office's lead dentist.  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. A at 7, Dkt. # 27-1.)

White continued to have attendance problems.  He would "joke" about his tardiness with his co-workers, explaining that he worked a second job at a nightclub and would oversleep in the mornings.  (*Id.* Ex. I at 52, Dkt. # 24-2; *id.* Ex. J at 58, Dkt. # 24-2.)  In his performance review on February 14, 2009, Zartman wrote, "[White] does have an attendance problem in that he is not always punctual.  I have brought this to his attention and this is something that he has been working on to improve."  (*Id.* Ex. E at 9, Dkt. # 24-2.)  The performance review stated that one of White's goals for the upcoming year was "[t]o improve attendance.  He understands the importance of being on time and the hardship it puts on his co-work[er]s when this happens . . . ."  (*Id.*)

On February 27, White arrived at work with conjunctivitis (pink eye).  (*Id.* Ex. C at 44, Dkt. # 24-1.)  He was sent home and could not return to work until he brought in a doctor's note stating he was not contagious.  (*Id.*)  White was given an unexcused absence for having to leave work due to the condition.  (*Id.* Ex. H at 39, Dkt. # 24-2.)

White continued to receive written warnings for tardiness and absenteeism.  He requested off from work on Monday, March 30, to have oral surgery.  (*Id.* Ex. E at 10, Dkt. # 24-2.)  Zartman asked him to schedule the operation for a Friday so that he had the weekend to recover because Zartman "couldn't have him off during the week for his

3

recovery." (*Id.* at 10–11.)  White did not reschedule and had the surgery as planned on

March 30.  (*Id.* at 11.)  He returned to work on March 31, but then missed work on

April 1 because his mouth was extremely swollen.  (*Id.*)  ADG gave him a written

warning for his absence.  (*Id.* at 10–11.)

On April 16, 2009, White was forty-seven minutes late for work and claimed that

road construction delayed him.  (*Id.* at 13.)  The following day, White called in to work

saying he was sick.  (*Id.* at 14.)  The consecutive attendance infractions resulted in a

written warning.  (*Id.*)  White received another written warning on April 23 for showing

up seven minutes late for work after claiming that he was stuck in traffic behind a

semi-truck.  (*Id.* at 16.)

White complained of a headache while at work on April 27, 2009.  (*Id.* at 19.)

ADG asked if White would be at work the next day because White was working the

closing shift.  (*Id.* at 20.)  White assured his supervisor that he would be at work, but

then called in sick.  (*Id.*)  ADG asked for a doctor's note when White returned to work on

April 29, but White did not have one.  (*Id.*)  ADG informed White that he would need to

provide a doctor's note for his absence on April 28 as well as for all future dates that he

called in sick.  (*Id.*)

On May 26, 2009, White came to work with a rash or fungal infection on his

hands.  (*Id.* Ex. C at 36–41, Dkt. # 24-1.)  Zartman sent White home and told him he

needed to get a doctor's note proving that the rash was not contagious before he could

return to work.  (*Id.* at 38.)  White claims that Zartman "rais[ed] her voice," (*id.* at 40),

and accused him of "knowingly putting the entire staff at risk," (Def.'s Resp. Pl.'s Mot.

Summ. J. at 9, Dkt. # 27.)  Zartman denies having made such a statement, (Pl.'s Mot.

4

Summ. J. Ex F at 29, Dkt. # 24-2), and a co-employee present during the incident asserts that Zartman did not scream at White, (*id.* Ex. I at 36, Dkt. # 24-2.)  White returned to work on May 27 and was not allowed to clock in until he provided Zartman with a doctor's note proving that the rash was not contagious.  (*Id.* Ex F at 30, Dkt. # 24-2.)  White claims that he was marked tardy due to this delay, (Def.'s Resp. Pl.'s Mot. Summ. J. at 10, Dkt. # 27), while Zartman maintains that White was only marked tardy if he showed up late, (Pl.'s Mot. Summ. J. Ex F at 30, Dkt. # 24-2).

White received his final written warning on July 13, 2009, for being twenty-three minutes late for work.  (*Id.* at 22.)  The warning stated that White's goal was no more unapproved absences or tardies and that he would be terminated if he failed to meet that goal.  (*Id.*)  By this point in White's eleven-month tenure with ADG, his timecard contained numerous entries in which he was marked tardy or as having an unexcused absence.  (*Id.* Ex. H, Dkt. # 24-2.)

On July 16, White missed work after being admitted to the hospital for wanting to commit suicide.  (*Id.* Ex. C at 47, Dkt. # 24-1.)  White was treated at the hospital until July 20.  Two days later, White obtained a letter from the hospital that said he would "not be able to return to work for medical reasons until evaluated by Dr. Carol Roekle and released for work by her." (*Id.* Ex. L at 69, Dkt. # 24-2.)  The letter disclosed that the appointment was scheduled for July 29, 2009.  (*Id.*)  ADG terminated White on July 27, 2009, explaining, "The motivating factor was the eight-day unplanned, unexcused absence with no definite return to work date, coupled with the ongoing attendance issues and the final corrective action that he signed that stated he would be terminated for his next absence or tardy."  (*Id.* Ex. M at 72–73, Dkt. # 24-2.)

5

White disputes the accuracy of his timecard.  He claims that the computer system marks employees as late or as having an unexcused absence whenever the time on the employee clock differs from the time the employee is scheduled to arrive. (Def.'s Resp. Pl.'s Mot. Summ. J. at 8, Dkt. # 27.)  White asserts that there were days in which ADG asked him to arrive late, leave early, or take an extended lunch, and then White's timecard marked him as tardy for obeying these requests.  (*Id.*)  White alleges he kept a "contemporaneous diary" in which he recorded such instances.  (*Id.*)  The diary contains twenty entries, with the first beginning on January 22, 2009.  (*Id.* at 9.)  Of those entries, there are eight dates[1] on which ADG either gave White a written warning or marked him tardy or absent on his timecard, but according to the diary, these attendance infractions were unwarranted because either ADG asked White to clock in at a time that differed from his work schedule, or he had a doctor's note excusing his absence.  (*Id.* at 9–10.)

Four of these conflicting entries refer to instances where White received a written warning.  White claims that he had a doctor's note for extreme swelling and for illness on April 1 and April 28, respectively, that should have excused both absences.  (*Id.* at 9.)  ADG asked White to arrive at 11:00 a.m. on April 16 and disciplined White for arriving at 11:47 a.m.  (Pl.'s Mot. Summ. J. at 13, Dkt. # 24-2.)  White, however, maintains that he was asked to arrive between 11:30 a.m. and 12:00 p.m.  (Def.'s Resp. Pl.'s Mot. Summ. J. at 9, Dkt. # 27.)  Finally, White also alleges that he had permission

---

[1]The dates of these instances are: February 19, March 25, April 1, April 16, April 28, May 27, June 17, and July 13.  (Def.'s Resp. Pl.'s Mot. Summ. J. at 9–10, Dkt. # 27.)

6

to arrive late to work on July 13, the day on which he received his final written warning. (*Id.* at 10.)

White asserts that at some time after being diagnosed he requested to sit at one work station and not switch with the other patient coordinators.  (*Id.* at 10.)  According to White, having his own station would have minimized his exposure to germs and, consequently, reduced the number of days he missed work due to illness.  (*Id.*)  White allegedly informed ADG that he could get a doctor's note stating that he should work at his own station, but claims ADG denied the request, saying that even if he provided a doctor's note, it would not allow White to have his own station because it was not fair. (*Id.*)  White cannot specify on what date he made the request, (id.), and ADG denies having been asked, (Pl.'s Mot. Summ. J. Ex K, at 64, 67, Dkt. # 24-2).

Following White's termination, he allegedly made public allegations that ADG had discriminated against him because he is HIV-positive and threatened to sue.  (Pl.'s Compl. ¶ 6, Dkt. # 1.)  ADG filed suit seeking a declaration that ADG did not violate federal or state employment laws, including the Americans with Disability Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, in connection with White's employment.  White filed a counterclaim alleging unlawful discrimination and a hostile work environment under the ADA.  (Def.'s Countercl. at 12, Dkt. # 4.)  The parties stipulated to ADG's motion for partial summary judgment dismissing White's hostile work environment counterclaim with prejudice.  (Stipulation and Order Granting Mot. Partial Summ. J. at 1, Dkt # 22.)  ADG now moves for summary judgment on White's unlawful discrimination claim.

## II.  STANDARD

7

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. When deciding summary judgment motions, "the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The court does not weigh the evidence to determine the truth of the matter, but rather to determine if the evidence creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson*, 477 U.S. at 249).

### III. DISCUSSION

8

The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  When an employer moves for summary judgment in response to an ADA claim, the employee must establish a prima facie case of discrimination by proving the following elements:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998).  The burden then shifts to the employer to provide a non-discriminatory explanation for the employment decision.  *Id.*  If the employer offers what appears to be a legitimate explanation, the employee then has the burden of "showing that the proffered explanation is pretextual."  *Id.*

ADG argues that White is not a "qualified individual" under the ADA because White's attendance problem precluded him from performing an essential function of his position.  An employee's "inability to satisfy [his employer's] basic attendance requirements" unqualifies the individual under the ADA.  *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the

9

attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA.") (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). ADG's employee handbook states that it "expects employees to be reliable and to be punctual in reporting for scheduled work. Absenteeism and tardiness place a burden on other employees and on [ADG]." (Pl.'s Mot. Summ. J. Ex. D at 2, Dkt. # 24-2.) This is presented as fact #5 in ADG's summary judgment motion and is uncontroverted by White in response. (*See* Scheduling Order at 7, Dkt. # 11) ("Any proffered fact in the movant's Statement of Material Facts that is not specifically contested will, for the purpose of the motion, be deemed admitted.")

ADG offers an abundance of evidence to illustrate White's difficulties with tardiness and absenteeism. Even in a most favorable light, White's timecard during his employment is replete with unexcused absences and instances of being late for beginning a shift or returning from lunch. White received his first written warning regarding his tardiness on October 7, 2008. On November 25, 2008, White had a meeting with his supervisors regarding his job performance. White testified at his deposition that he was told at the meeting that he "needed to watch being absent," (*id.* Ex. C at 58, Dkt. # 24-1), though the written warning White received from that meeting referred only to his time management problems and made no mention of his absenteeism, (id. Ex. E at 6, Dkt. # 24-2). White's performance review on February 14, 2009, found that White "does have an attendance problem in that he is not always punctual." (Mot. Ex. E at 9, Dkt. 24-2.) The review listed "improve[d] attendance" as one of White's goals for the year and stated, "[White] understands the importance of being on time and the hardship it puts on his co-work[er]s when this happens." (*Id.*)

10

White received a written warning on April 2, 2009, for missing work to recover from oral surgery.  ADG asserted in the warning that the absence could have been avoided had White acquiesced to ADG's request of scheduling the surgery on a Friday, thus having the weekend to recover, instead of on a Monday as White insisted.  Later that same month, White was given two written warnings for tardiness and a third for calling in sick without providing a doctor's note.  White received his last written warning on July 13, 2009.  That warning, which White signed, stated that his goal was to have no more unapproved absences or tardies and that he would be terminated if he failed to meet the goal.

The catalyst for White's termination was his eight-day unexcused absence in mid-July.  On July 16, White was admitted to the hospital for having suicidal thoughts.  White was treated in the hospital and released four days later.  On July 22, White obtained a letter from the hospital saying he would "not be able to return for work for medical reasons until evaluated by Dr. Carol Roekle and released for work by her."  (*Id.* Ex. L at 69, Dkt. # 24-2.)  The letter did not indicate when White would be returning to work, saying only that an appointment with the doctor was scheduled for July 29.  ADG terminated White on July 27, 2009, taking into consideration his history of attendance problems and his eight-day absence without any clear return date.

White argues that whether he was able satisfy ADG's attendance requirements is a genuine issue of material fact.  ADG ran a "very informal office," (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. B at 7, Dkt. # 27-2), and did "not have a sick time policy," (*id.* Ex. C at 11, Dkt. # 27-3).  Even when a person provided a doctor's note for missing work, it "depend[ed] on the situation" whether the absence was deemed excused or unexcused.

11

(*Id.*)  Employee absences for illness would be considered excused if the Family Medical

Leave Act or ADA permitted the employee to miss work.  (*Id.*)

White claims his record of absences and tardies is "seriously flawed."  (Def.'s

Resp. Pl.'s Mot. Summ. J. at 14, Dkt. # 27.)  He argues that the computer system

marked him as late or as having an unexcused absence whenever the time clock

differed from his schedule, even though some of his tardies and absences were

excused or precipitated by ADG.  (*Id.* at 8, 14.)

White kept what he categorizes as a "contemporaneous diary" in which he

recorded the days upon which he was asked to arrive late or leave early "so that the

deceptive, falsified attendance record relied upon by [ADG] in terminating White's

employment was exposed."  (*Id.* at 8.)  The diary disputes eight instances, from January

2009 to July 2009, in which White was written up or marked as tardy or absent.  White

argues that each occurrence was unjustified because either ADG asked him to arrive at

a time that differed from his schedule or he had a doctor's note excusing his absence.

(*Id.* at 9–10.)  The remaining entries are either consistent with ADG's account or

immaterial.[2]

---

[2]For example, the June 7, 2009 entry is immaterial.  On that date, White alleges
that he felt ill, informed ADG that he needed to go to the doctor, provided ADG with a
doctor's note, but was still marked for an unexcused absence.  (Def.'s Resp. Pl.'s Mot.
Summ. J. at 10, Dkt. # 27.)  However, June 7, 2009, was a Sunday.  White was not
scheduled to work that day, and his timecard does not list him as being tardy or absent.
(Pl.'s Mot. Summ. J. Ex. H at 41, Dkt. # 24-2.)  In addition, there is some doubt about
the accuracy of the diary's notations, in that they seem to shift somewhat.  (*See* Pl.'s
Reply Br. Supp. Mot. Summ. J. at 2–3, Dkt. # 28) (noting that the diary entry for May 26
and 27, 2009, found within White's response brief contains factual allegations not stated
in the version of the diary attached as an exhibit to the response brief).

While White's diary creates a factual dispute for the eight entries in which his story conflicts with ADG's, the diary is not enough to create a genuine issue of material fact regarding White's ability to satisfy ADG's attendance requirements. White does not disagree with any of the other instances of absenteeism or tardiness listed on his timecard beyond those eight entries. It is undisputed that White was first written up for attendance problems in October, 2008, and continued to experience difficulties throughout his employment, as evidenced by his February 2009 performance review and written warning on April 23. White does not dispute that he joked with his co-workers about oversleeping in the mornings after working at a nightclub. Most significantly, White concedes that he was absent from work for eight consecutive days, unexcused, and was unable to inform ADG when he would return to work.

White claims that he requested a reasonable accommodation that, had it been provided, would have reduced his absences. White rotated bi-weekly between stations with the other three patient coordinators. Because White is HIV-positive, he is more susceptible to illness and suffers worse symptoms than the average person when he gets sick. White claims that he made a request to work at his own work station and not switch so that he could avoid exposure to his fellow employees' germs and, consequently, reduce the number of days he missed work for illness. White does not remember when he requested the accommodation, claiming only that he made the request after his diagnosis. ADG denies that White ever asked for his own station.

To show that an employee is "qualified" under the ADA, the "employee must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such accommodation." *Cehrs v. Ne.*

13

*Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998).  The employee's "burden of articulating a reasonable accommodation need not be onerous."  *Id.*  "If the employee establishes that a reasonable accommodation is possible, then the employer bears the burden of proving the accommodation is unreasonable and imposes 'undue hardship' on the employer."  *Id.*

White has not offered sufficient evidence to allow a jury to conclude that having his own work station would have improved his attendance record.  White claims that he asked his physician, Dr. Barnett, if working at a separate work station would improve his health.  Allegedly, Dr. Barnett "[did not] have an issue doing it" and "said it would be best for [White's] . . . health."  (Pl.'s Mot. Summ. J. Ex. C at 23, Dkt. # 24-1.)  Dr. Barnett, however, denies ever speaking with White about a workplace accommodation or taking any measures to limit his exposure to germs.  (*Id.* Ex. N at 76, Dkt. 24-2.)

Regardless of whether Dr. Barnett spoke with White about having his own station, or whether ADG was ever informed of the request, White has not offered any evidence to prove that the accommodation would have improved his attendance record.  White has not identified specific instances in which he missed work for an illness that would have been prevented had he worked at his own work station.  White simply "believe[s] there were several instances where [he] picked something up" but is unable to recall when those instances occurred.  (Def.'s Resp. Pl.'s Mot. Summ. J. Ex. A at 14–15, Dkt. # 27-1.)  Furthermore, White's accommodation would not have prevented his eight-day absence that sparked his termination.  White was admitted to the hospital for having suicidal thoughts, a condition unrelated to having a single work station.

14

2:11-cv-15534-RHC-PJK   Doc # 29   Filed 11/30/12   Pg 15 of 15   Pg ID 604

White also asserts that an alternate accommodation, "such as more stringent cleaning measures" could have been implemented to reduce his risk of illness. (*Id.* at 17.) Similar to the separate work station accommodation, no evidence has been offered to show that improved cleaning measures would have resulted in White missing fewer days of work for illness.

## IV.  CONCLUSION

Accordingly, IT IS ORDERED that Plaintiff's/Counter-Defendant's motion for summary judgment [Dkt. # 24] is GRANTED.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 30, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 30, 2012, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\11-15534.ADG.Grant.SJ.wpd